**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **WILFREDO TORRES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.:  08 CV 3842** |
| **v.** | ) | |
| | ) | **Judge Pallmeyer** |
| **EXELON CORPORATION,** | ) | |
| | ) | **Magistrate Judge Denlow** |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

Defendant Exelon Corporation ("Exelon") has moved to dismiss the instant Complaint on three bases:

1. The Complaint fails to name the Plaintiff's employer;

2. The Defendant is not an employer; and

3. Plaintiff's allegation in Count II—that he was discharged because he was incapable of doing his job—fails to state a claim.

The legal grounds for each of these aspects of the Motion to Dismiss are set out below.

**I.  The Complaint Fails To State A Claim Because It Fails To Name Plaintiff's Employer**

Count I of the Complaint purports to state a claim of employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII").  Count II purports to state a claim of employment discrimination under Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12010, *et seq.* ("ADA").

Section 703 of Title VII, 42 U.S.C. § 2000e-2, makes it illegal for an "employer" to, among other things, "discharge" an individual because of his national origin.  In this case, however, Plaintiff alleges that his employer was "Commonwealth Edison."  Complaint ¶ 3.  He

does not allege that he ever worked for Exelon.  Thus, on its face, the Complaint fails to state a claim *against Exelon* under Title VII.

Similarly, § 102 of the ADA, 42 U.S.C. § 12112, makes it illegal for a "covered entity" to discriminate against a qualified individual with a disability regarding the "discharge of employees."  A "covered entity" is defined to mean, "an employer, employment agency, labor organization, or joint labor-management committee."  42 U.S.C. § 12111.  Once again, Plaintiff has never alleged that he is an employee of Exelon.

Plaintiff does allege that Exelon "owns" Commonwealth Edison, but that is not sufficient to impose liability under either Title VII or the ADA.  An affiliated corporate entity may be held liable under Federal anti-discrimination laws if (1) the corporate formalities are neglected to the extent that it is appropriate to pierce the corporate veil, (2) the affiliated corporations have structured themselves for the express purpose of avoiding liability under the discrimination laws, or (3) the affiliated corporation directed the discriminatory action.  *Worth v. Tyer*, 276 F.3d 249, 259-260 (7th Cir. 2001) (explaining *Papa v. Katy Indus.*, 166 F.3d 937, 940-941 (7th Cir. 1999)).  Plaintiff has not alleged anything against Defendant other than it owned Commonwealth Edison.

Nor is it sufficient for Plaintiff to speculate that at some point he might be able to prove something that would allow the Court to impose liability.  "[I]t is not enough for a complaint to avoid foreclosing possible bases for relief; it must actually suggest that the plaintiff has a right to relief by providing allegations that 'raise a right to relief above the speculative level'." *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 777 (7th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U. S. __, 127 S. Ct. 1955, 1965; 1968-69 (2007)).  In this case, Plaintiff has not even avoided foreclosing possible bases for relief; he specifically alleges that he worked for Commonwealth Edison.  Because this is an *employment* discrimination case, the Complaint should be dismissed without further consideration.

**II.      The Court Cannot Impose Relief Because Exelon Is Not An Employer**

Under both Title VII and the ADA, an entity that has fewer than 15 employees is not an "employer" and is, therefore, exempt from liability under most circumstances. *See,* 42 U.S.C. §§ 12111(5)(A) & 2000e(b).   The corporate structure of Exelon Corporation and its relationship with Commonwealth Edison Company is set out in *Kennedy v. Commonwealth Edison Company,* 410 F.3d 365 (2005).   On October 20, 2000, Exelon merged with Unicom Corporation, which had previously been Commonwealth Edison's corporate parent. *Id.* at 367.   Attached as Exhibit A to this Memorandum is an Order from the Securities and Exchange Commission, which describes the same transaction.   The SEC describes Exelon as a "holding company," which, by definition, performs no corporate activity other than holding stock.   This is confirmed by Exhibit B, which is a copy of the opinion of the Texas Court of Appeals in *Carpenter v. Exelon Corporation*, 2007 Tex. App. LEXIS 8348 (2007).   The Court in that case held that "Exelon Corporation" did not operate a website in Texas because it was a holding company, without business operations or employees.   Although this information is not within the four corners of the Complaint, it is a matter of public record, and can be considered when deciding a Rule 12(b)(6) motion.   "[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Trust*, 500 F.3d 454, 461 (5th Cir. 2007).

In light of the fact that "Exelon Corporation" is a mere holding company, without employees, this "employment discrimination" action is clearly improper.   Moreover, this is not a case where an unsophisticated litigant has used the wrong words to describe his employer.   As noted, Plaintiff acknowledges that his employer was Commonwealth Edison Company; he cannot be confusing Commonwealth Edison Company with its corporate parent.   For some unknown reason, Plaintiff has decided to sue an entity that has no employees.   Accordingly, he fails to state a claim upon which relief can be granted.

**III.    Count II Fails To State A Claim Because It Depends On Plaintiff's Allegation That He Is Incapable Of Performing His Job**

Paragraph 16 of the Complaint incorporates by reference the underlying Charge of Discrimination, which is attached as Exhibit A to the Complaint.  In his Charge, Plaintiff alleges that from September 23, 20004 until September 2005 he was on disability leave because of his severe depression.  He further alleges that he was discharged for allegedly falsifying his disability in an independent medical examination.  Charge, ¶¶ II & V.  He says that the reason given for his discharge is pretextual.  ¶ VII.  In other words, Plaintiff is alleging that he was discharged for falsely claiming that his depression was so severe that he could not work.

There are only two possibilities: either this reason is true or it is false.  If the articulated reason is true, Plaintiff loses because it is his burden to establish that the reason given for his termination is a lie that masks a discriminatory motive. *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006).  On the other hand, if the articulated reason for the discharge is true, Plaintiff must have been telling the truth when he claimed that his depression was so severe that he could not work.

Yet, the ADA protects only individuals who are "qualified," and the word "qualified" is defined as a person with a disability, "who, with or without reasonable accommodation, can perform the essential functions" of the job in question.  42 U.S.C. § 12111(8).  Accordingly, Count II fails to state a claim under the ADA.

Once again, this is not some pleading "trap" that Plaintiff has fallen into because he is an unsophisticated litigant.  The Court can take judicial notice of the fact that Plaintiff previously sued Defendant under the Employee Retirement security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* ("ERISA").  The complaint in that case (*Torres v. Exelon Corporation, et. al*, No. 06-Cv-1416) alleged that Plaintiff was fired in order to prevent him from receiving disability plan benefits. Plaintiff voluntarily dismissed that complaint after Defendant pointed out, among other things, that Plaintiff had not exhausted his administrative remedies under ERISA.  That complaint was

dismissed on June 6, 2006, over two years ago. *See, Id.*, at Docket No. 19. Plaintiff has clearly thought about the various causes of action he might pursue and chosen to pursue his ADA theory, even though he *insists* that he could not perform his job.

Accordingly, Defendant Exelon Corporation respectfully requests that the instant Complaint be dismissed and that it be granted such further and additional relief as the Court deems just and proper.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td>Dated: August 11, 2008</td><td>DEFENDANT EXELON CORPORATION</td></tr>
<tr><td></td><td>By: ____s/Kent Sezer_____<br>One of its attorneys</td></tr>
</table>

Kent Sezer
Exelon Business Services Company
10 South Dearborn Street, 49th Floor
Chicago, Illinois 60603
(312) 394-7158
(312) 394-4895 fax

Attorney For Defendant Exelon Corporation



## U.S. Securities and Exchange Commission

## SECURITIES AND EXCHANGE COMMISSION

(Release No. 35-27737; 70-9645)

**Exelon Corporation and PECO Energy Company**

**Supplemental Order Authorizing Extension of Time for Divestiture of Nonutility Assets**

**October 20, 2003**

Exelon Corporation ("Exelon"), Chicago, Illinois, a registered holding company, and PECO Energy Company ("PECO"), Philadelphia, Pennsylvania, a public utility subsidiary of Exelon (collectively, "Applicants"), have filed with the Securities and Exchange Commission ("Commission") a post-effective amendment to an application-declaration ("Application") previously filed under sections 3(a)(1), 4, 5, 6(a), 7, 8, 9(a)(1), 9(a)(2), 9(c)(3), 10, 11(b), 12 and 13 of the Public Utility Holding Company Act of 1935, as amended ("Act") and rules 43, 44, 54 and 80 through 92 under the Act. The Commission issued a notice of the filing of the Application on August 21, 2000.[1]

In orders issued on October 19, 2000 ("Merger Order"),[2] and November 2, 2000[3] as supplemented by December 8, 2000[4] (collectively, "Financing Order"), the Commission approved, among other things, the acquisition by Exelon of all the common stock of PECO and Unicom Corporation ("Unicom"), followed by a merger of Unicom with and into Exelon ("Merger"). As of January 1, 2001, Exelon effectuated the corporate restructuring ("Restructuring") contemplated in the Merger Order. In summary, the Restructuring consisted of the transfer of electric generating assets of Commonwealth Edison Company, a public utility subsidiary of Exelon, and PECO to Exelon Generation Company ("Genco"), an Exelon public utility subsidiary and registered holding company, and the transfer of PECO's and Unicom Enterprises, Inc.'s non-utility subsidiaries to be indirect subsidiaries of Exelon Ventures Company, LLC, a registered holding company and first tier subsidiary of Exelon.

In the Merger Order, Exelon requested the Commission to reserve jurisdiction over the retention of various interests, including Eastern Pennsylvania Development Company

("EPDC") and its subsidiaries. Exelon stated that it would divest these interests within three years subsequent to the date of the Merger Order or make a filing with the Commission prior to the expiration of one year from the date of the Merger Order explaining why it should be permitted under the Act to retain them. In Post-Effective Amendment No. 2 under File No. 9645, Exelon explained that, at the time of the Merger, EPDC held (1) Exelon Fossil Holdings, Inc., an exempt wholesale generator ("EWG"), (2) the Exelon Peaker Development Limited, LLC ("Exelon Peakers") and ExTex Power, LP ("ExTex companies"), also EWGs, and (3) Adwin Realty Company ("Adwin") and its partnership interests (mainly real estate investments). As part of the Restructuring, EPDC was dissolved, Exelon Fossil Holdings, Inc., Exelon Peakers and ExTex companies were transferred to Genco and Adwin remained a subsidiary of PECO. Exelon further advised that PECO was in the process of disposing of the real estate investments of Adwin and Adwin would be dissolved and/or its assets disposed of prior to October 20, 2003, as required by the Merger Order.

Applicants state that they have attempted to divest the estate assets of Adwin and have been successful in reducing those assets from a balance of $7,435,378 as of October 20, 2000, to a balance of $2,657,407 as of June 30, 2003. However, Applicants further state that due the difficult economic environment over the course of the three years since the Merger Order, PECO will not be able to complete to the disposition of the Adwin real estate investments prior to October 20, 2003. Accordingly, Exlon seeks an extension of time to complete the disposition of the remaining Adwin investments until October 20, 2006.

Exelon states, for purposes of rule 54, that it is in compliance with all requirements of rule 53(a). In the Financing Order, the Commission, among other things, authorized Exelon to invest in EWGs and foreign utility companies ("FUCOs"), as defined in sections 32 and 33 of the Act, up to $4 billion in aggregate investment, as defined in rule 53(a)(1)(i), in EWGs and FUCOs ("EWG/FUCO Limit"). As of June 30, 2003, Exelon's aggregate investment in EWGs and FUCOs was approximately $2,806 million. As of June 30, 2003, Exelon's average consolidated retained earnings was $2,150 million. Although Exelon's aggregate investment exceeds the 50% "safe harbor" limitation contained in rule 53, Exelon's aggregate investment is below the EWG/FUCO Limit authorized by the Financing Order.

In addition, Exelon states that it complies with the record-keeping requirements of rule 53(a)(2) and the employee

limitation under rule 53(a)(3); Exelon further states that it will comply with the limitation under rule 53(a)(4) concerning the submission of copies of certain filings under the Act to retail regulatory commissions. Finally, none of the circumstances described in rule 53(b) has occurred or is continuing.

Exelon represents that there has been no material adverse impact on its consolidated capitalization resulting from Exelon's investments in EWGs and FUCOs since the date of the Financing Order and that the proposed transactions will not have any material impact on Exelon's capitalization. Exelon's consolidated equity to total capitalization ratio (Common Equity Ratio) was 31.3% as of December 31, 2000, and as of June 30, 2003, its Common Equity Ratio was 33.7%. Further, Exelon states that its EWG and FUCO investments have been profitable for all annual periods ending December 31, 2000, through December 31, 2002, and for the quarter ended June 30, 2003.

Fees and expenses expected to be incurred in connection with the proposed transactions are estimated to be not more than $10,000. Applicants state that no other state or federal commission, other than this Commission, has jurisdiction over the proposed transactions.

Due notice of the filing of the Application has been given in the manner prescribed by rule 23 under the Act, and no hearing has been requested of or ordered by the Commission. Based on the facts in the record, the Commission finds that the applicable standards of the Act are satisfied and that no adverse findings are necessary.

IT IS ORDERED that the Application, as amended, be granted and permitted to become effective immediately, subject to the terms and conditions prescribed in rule 24 under the Act.

For the Commission, by the Division of Investment Management, pursuant to delegated authority.

Margaret H. McFarland
Deputy Secretary

**Endnotes:**

[1] Holding Co. Act Release No. 27214.

[2] Holding Co. Act Release No. 27256.

[3] Holding Co. Act Release No. 27266.

[4] Holding Co. Act Release No. 27296.

*http://www.sec.gov/divisions/investment/opur/filing/35-27737.htm*

2 of 2 DOCUMENTS

### TIMOTHY J. CARPENTER, MERVIN G. SCHAEFER, JAMES P. MALONEY, OLDCOSY CORPORATION, HENRY JACKSON, DAVID REINDI, HENRY C. HESS, DAVID FALLDORF and JANE P. KOTH, Appellants v. EXELON CORPORATION and EXELON ENTERPRISES COMPANY, L.L.C., Appellees

### NO. 14-07-00149-CV

### COURT OF APPEALS OF TEXAS, FOURTEENTH DISTRICT, HOUSTON

### 2007 Tex. App. LEXIS 8348

### October 23, 2007, Judgment Rendered
### October 23, 2007, Memorandum Opinion Filed

**SUBSEQUENT HISTORY:** Petition for review denied by *Carpenter v. Exelon Corp., 2008 Tex. LEXIS 364 (Tex., Apr. 11, 2008)*

**PRIOR HISTORY:** [*1]
On Appeal from the 133rd District Court, Harris County, Texas. Trial Court Cause No. 2005-61496.

**COUNSEL:** For Appellants: Roger Sherman Braugh Jr., John T. Flood, Corpus Christi, TX., David George, Houston, TX.

For Appellees: Cheryl Jerome Moore, Christopher Robin Richie, Dallas, TX., Karlene Dunn Poll, Rebecca L. Robertson, Houston, TX.

**JUDGES:** Panel consists of Justices Frost, Seymore, and Edelman. *

> * Senior Justice Richard H. Edelman sitting by assignment.

**OPINION BY:** Richard H. Edelman

**OPINION**

**MEMORANDUM OPINION**

In this interlocutory appeal, Timothy J. Carpenter, Mervin G. Schaefer, James P. Maloney, Oldcosy Corporation, Henry Jackson, David Reindi, Henry C. Hess, David Falldorf and Jane P. Koth ("appellants") appeal an order granting the special appearances [1] filed by Exelon Corporation ("Exelon") and Exelon Enterprises Company, L.L.C. ("Enterprises") on the grounds that the trial court had general and specific jurisdiction over them. We affirm.

> 1   *See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7)* (Vernon Supp. 2006) (allowing appeal from an interlocutory order that "grants or denies the special appearance of a defendant . . .")

**Background**

Exelon Corporation is a utility holding company that owns Exelon Enterprises Company, L.L.C.. Enterprises, in turn, owned a 97% interest in InfraSource, Inc. ("InfraSource"), and appellants, along with others, owned the remaining 3%. Enterprises sold InfraSource to GFI Energy Ventures ("GFI"). As part of the merger [*2] agreement (the "agreement") for this transaction, Enterprises agreed to indemnify InfraSource for potential environmental remediation at a property located in Deer Park, Texas, and Exelon agreed to guarantee Enterprises's indemnity obligation to InfraSource.

Appellants sued appellees and others in Harris County, Texas for breach of fiduciary duty, fraud, and negligence in connection with the sale of InfraSource to GFI. Appellees filed special appearances, which the trial court granted, dismissing appellants' suit against appellees.

**Standard of Review**

A court's exercise of personal jurisdiction over a nonresident defendant is an issue of law that "is reviewed *de novo. Moki Mac River Expeditions v. Drugg, 221 S.W.3d 569, 574 (Tex. 2007)*. Where, as here, a trial court does not issue findings of fact or conclusions of law, all facts necessary to support the trial court's ruling and sup-

ported by the evidence are implied in favor of the trial court's decision. *Id.*

## Personal Jurisdiction

The Texas long-arm statute authorizes personal jurisdiction over a nonresident defendant who "does business" in Texas. *See Tex. Civ. Prac. & Rem. Code § 17.042(1)* (Vernon 1997). However, because the long-arm [*3] statute reaches only as far as federal due-process requirements permit, personal jurisdiction can only be exercised over a defendant who has sufficient minimum contacts with the forum state, and only if the assertion of jurisdiction comports with "traditional notions of fair play and substantial justice." *IRA Res., Inc. v. Griego, 221 S.W.3d 592, 596 (Tex. 2007)*. To meet the minimum contacts requirement, a defendant must act deliberately and "purposefully avail" itself of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of its laws. *Id.* [2]

> 2   In determining the purposeful availment requirement: (1) only the defendant's forum state contacts matter, not anyone else's; (2) the contacts must be purposeful, not merely random, isolated, or fortuitous; and (3) a nonresident defendant must seek some benefit, advantage, or profit by "availing" itself of the jurisdiction, thus impliedly consenting to suit in the forum. *See Michiana Easy Livin' Country, Inc. v.Holten, 168 S.W.3d 777, 785 (Tex. 2005)*.

A nonresident defendant's forum state contacts may give rise to two types of personal jurisdiction. *Moki, 221 S.W.3d at 575*. If the defendant has [*4] made continuous and systematic contacts with the forum state, general jurisdiction is established whether or not the defendant's alleged liability arises from those contracts. *Id.* Conversely, specific jurisdiction is established if, among other things, the defendant's alleged liability arises out of or is related to an activity conducted within the forum. *Id. at 575-576*.

### Specific Jurisdiction

Appellants' first issue challenges the granting of appellees' special appearance based on specific jurisdiction, which requires a substantial connection between the defendant's in-state activities and the operative facts of the litigation. *Id. at 584-85*. [3]

> 3   *See, e.g., Moki, 221 S.W.3d at 585, 587-88* (deciding that a nonresident's in-state promotional activities were too attenuated to satisfy specific jurisdiction in Texas because the actual focus of the litigation at trial would be the alleged negligence of the defendant for failing to exercise rea-

sonable care); *BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 796-97 (Tex. 2002)* (deciding that specific jurisdiction did not exist over a foreign subsidiary where the plaintiff's causes of action could only arise from activities that occurred [*5] outside of Texas).

In this case, appellants contend that: (1) appellees purposefully availed themselves of the benefits of conducting business in Texas by agreeing to indemnify InfraSource for costs incurred for remedial work in Deer Park, Texas; and (2) appellees' alleged liability in this case is substantially related to the environmental remediation indemnity provision that is applicable to the property located in Texas. Although appellants concede that no Texas case has held that an indemnity provision is alone sufficient to support specific jurisdiction, they assert that the indemnity provision in this case is like a standard insurance policy that provides for coverage anywhere in the world that the policyholder does business and should therefore provide a basis for minimum contacts in Texas. [4] Appellants also contend that the appellees' contacts with Texas were purposeful and that appellees will benefit from Texas environmental laws, which will determine and limit the extent of their indemnification obligation.

> 4   *Compare Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 232 (Tex. 1991)* (holding that the liability insurer of a corporation and its [*6] 120 subsidiaries located in many countries, including the United States, could reasonably anticipate litigation in any state), *with Malaysia British Assurance, SDN, BHD, v. El Paso Reyco, Inc., 830 S.W.2d 919, 921 (Tex. 1992)* (holding that in personam jurisdiction could not be exercised by a Texas court over a foreign corporation that reinsured a policy of insurance issued by another foreign corporation to cover a Texas resident).

However, appellants cite no authority, and we have found none, indicating that an indemnity agreement is the equivalent of insurance policy for purposes of establishing minimum contacts; and at least three Texas cases [5] have held that an indemnity obligation is not sufficient to establish specific jurisdiction where, as here, the claims asserted are not based on a breach of that obligation. [6] *See Moki, 221 S.W.3d at 585*. Because the merger agreement was not executed in Texas, and appellants do not allege that appellees have committed any actionable conduct in this State, let alone any such conduct that relates to actual activities here, specific jurisdiction over the appellees has not been shown. Accordingly, appellants' first issue is overruled.

5  *See Exito Elecs., Co. v. Trejo, 166 S.W.3d 839, 857 (Tex. App.-Corpus Christi 2005, no pet.);* [*7] *Koll Real Estate Group, Inc. v. Howard, 130 S.W.3d 308, 316 (Tex. App.-Houston [14th Dist.] 2004, no pet.); Koll Real Estate Group, Inc. v. Purseley, 127 S.W.3d 142, 147-48 (Tex. App.-Houston [1st Dist.] 2003, no pet.).*

6  In the merger, Enterprises received $ 25 million for undertaking various obligations, including the contingent liability for the indemnity obligation. Appellants contend that appellees overstated the amounts of these contingent liabilities in order to receive a portion of the merger proceeds without paying appellants their pro rata share. Appellants claim that, because appellees' promise to indemnify InfraSource for money it may spend on environmental remediation in Texas is one of the alleged overvalued contingent liabilities, there is a substantial connection between appellees' in-state activities and the operative facts of this lawsuit.

*General Jurisdiction*

Appellants' second issue contends that the trial court had general jurisdiction over appellees because: (1) appellees own and operate a website that is accessible from Texas; and (2) the website is highly-interactive in that it allows customers and vendors to conduct business through the website.

General jurisdiction [*8] allows the exercise of jurisdiction over a defendant if its contacts with the forum state are continuous and systematic, even if the cause of action did not arise from or relate to those contacts. *PHC-Minden L. P. v. Kimberly-Clark Corp. No. 05-0823, 235 S.W.3d 163, 2007 Tex. LEXIS 796, 2007 WL 2457843, at *2-3, (Tex. Aug. 31, 2007).* Internet websites may support a finding of general jurisdiction, and most courts use a "sliding scale" to determine whether Internet activity permits general jurisdiction.[7] At one end of the sliding scale, a website may support a finding of personal jurisdiction when a defendant clearly does business over the Internet by entering into contracts and repeatedly transmitting computer files to and from the forum state.[8] At the other end, personal jurisdiction cannot be exercised over a defendant who merely "passively" posts information on the Internet.[9] Courts evaluate contacts in the middle of this sliding scale based on the level of interactivity and the commercial nature of the exchange of information. *Experimental Aircraft, 76 S.W.3d 496 at 507.*

7  *See e.g., Experimental Aircraft Ass'n, Inc. v. Doctor, 76 S.W.3d 496, 506-07 (Tex. App.-Houston [14th Dist.] 2002, no pet.); but* [*9] *see Weldon-Francke v. Fisher, No. 14-06-00834-CV,* 237 S.W.3d 789, 2007 Tex. App. LEXIS 7389, 2007 WL 2592990, at * 8 & n.4 (applying "sliding scale" and stating: "We note that even if the website were on the opposite end of the sliding scale [allowing a defendant to do business over the Internet], research shows no Texas cases holding that general jurisdiction can be based on such a website alone ... ").

8  *Experimental Aircraft.76 S.W.3d at 506-07; Compuserve, Inc. v. Patterson, 89 F.3d 1257, 1264 (6th Cir, 1996).*

9  *Experimental Aircraft, 76 S.W.3d at 506-07.*

In this case, appellants contend that the website, www.exeloncorp.com, is owned and operated by Exelon because the website states it "is owned and operated by Exelon Corporation and its affiliates" and contains the phrase "8 2002 Exelon Corporation." However, Scott Peters, the Assistant Corporate Secretary for Exelon, testified that the website is operated by Exelon Business Services Company, a separate corporation from appellees. Moreover, there is evidence that Exelon is a holding company with no employees or business operations of any type, and Peters testified, accordingly, that no Exelon employees operate the website. Additionally, the website only "passively" provides information [*10] to users about Exelon (Enterprises is not mentioned in the website at all [10]) and does not allow Exelon to interact with users or they with it.[11] Because the record thus reflects that neither appellee operates the website, and the website was not interactive with respect to either of them, it does not support a finding that either appellee had systematic contacts with Texas based on the website. Accordingly, appellants' second issue is overruled, and the judgment of the trial court is affirmed.

10  There is no evidence that Enterprises has any connection to the website and appellants' brief does not argue that the website is a basis for general jurisdiction over Enterprises.

11  *See CSR Ltd. v. Link, 925 S.W.2d 591, 595 (Tex. 1996)* (requiring that a defendant conduct substantial activities with the forum); *Reiff v. Roy, 115 S.W.3d 700, 706 (Tex. App.-Dallas 2003, pet. denied)* (finding that a website providing maps and directions did not constitute systematic and continuous contact between the defendant and Texas). Appellants argue that Exelon's subsidiaries' customers and suppliers are able to engage in online transactions through the website. However, the use of the website by Exelon's [*11] subsidiaries generally cannot be imputed to Exelon to establish personal jurisdiction over Exelon. *See, e.g., Commonwealth Gen. Corp. v. York, 177 S.W.3d 923, 925 (Tex. 2005)* (stating, when analyzing personal jurisdiction,

2007 Tex. App. LEXIS 8348, *

"separate corporations are presumed to be distinct entities"); *Zamarron v. Shinko Wire Co., 125 S.W.3d 132, 142 (Tex. App.-Houston [14th Dist.] 2003, pet. denied)* (stating "[a]s long as the parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other."). In addition, appellants have asserted no claims to dis-

regard the separate legal existence of these corporations.

/s/ Richard H. Edelman

Senior Justice

Judgment rendered and Memorandum Opinion filed October 23, 2007.